Good morning, everyone. We have six cases on this morning's calendar. We'll begin with Appeal No. 22-2436, Douglas Mann v. LSQ Funding, Mr. Klein. Good morning, Your Honors, and may it please the Court. I'm Randy Klein, Counsel for Douglas Mann, Chapter 7 Trustee for the Estate of Angstrom, Inc. Angstrom was a fraudulent enterprise that left over a dozen creditors holding claims against the estate, primarily a claim by Millennium Funding in excess of $10 million and another 12 or 13 claims of other creditors, including several credit card companies aggregating nearly a quarter of a million dollars. One of the creditors was lucky, LSQ. LSQ was able to get paid when they demanded, prior to bankruptcy, that the debtor repurchase invoices that had been purchased by LSQ and were fraudulent. The debtor was able to obtain new funds from a second creditor, Millennium Funding. The debtor entered into a contract with Millennium Funding. Millennium did not enter into a contract with LSQ. Millennium did not purchase the claim from LSQ. They're not the assignee of LSQ's factoring agreement. They entered into their own agreement with the debtor, pursuant to which the debtor agreed to sell invoices to Millennium in exchange for a purchase price. In order to obtain those invoices, they had to be repurchased from LSQ. In order for that to occur, the debtor directed the payment to Millennium to go from Millennium to LSQ. This was the debtor's right under the contract to obtain $10.3 million. That interest under that contract is the purchase price, or the assets that were acquired. Mr. Kline, did this payment from Millennium to LSQ have any effect on the funds that the debtor had available to pay the creditors? From a preference perspective, Your Honor, there was no adverse effect, no diminution, using the words of the earmarking doctrine, on other creditors, but that is not a requirement with respect to a fraudulent transfer. But you agree that this payment did not impact the debtor's estate at all? So in other words, the money that the debtor had to pay creditors wasn't impacted at all? Other than LSQ? From a net effect, the answer to that question is yes. In other words, there were multiple transactions. Initially, the debtor obtained the funds. It used those funds exclusively to pay one creditor. So when you net them out, there was no net effect. I'm sorry to interrupt. Did the debtor obtain the funds? It looks like the funds went directly to LSQ from Millennium. The debtor obtained the funds pursuant to its contract. There were only two parties to that contract, the debtor and Millennium. But never physically had the funds? There was never a physical transfer. The debtor directed Millennium. Millennium funded the payment on behalf of the debtor and at the debtor's direction to LSQ. So they structured it, Mr. Kline, as a one-step transaction, where the payment went from Millennium to LSQ, but of course they didn't have to. They could have structured it as a two-step transaction, because I think one of the points that you're making is economically it's the exact same. This is new financing to Engstrom, the debtor, from Millennium. They could have structured it where Engstrom received the $10 million, and then the same moment it received it, it just could have wired it out to LSQ to pay LSQ off. They could have structured it that way, Your Honor. The fact is, because it was an invoice purchase agreement, the invoices had to be repurchased from LSQ first. For purposes of a 548A fraudulent transfer, do creditors need to be harmed? In connection with an actual intent to defraud under 548A, the answer is no. I thought that, haven't courts uniformly held that under 548A, that you don't need to ask the question about whether creditors are harmed as a result of a fraudulent conveyance or fraudulent transfer? That's correct, Your Honor. You're looking at whether there was an actual intent to hinder, delay, or defraud. Then in that case, under 548, you're looking at whether any entity was defrauded, singular. Also, under 544B, where the trustee is stepping into the shoes of a creditor, in this case, Millennium Shoes, under Wisconsin Uniform Fraudulent Transfer Act, that's also looking at actual intent to hinder, delay, or defraud a creditor. But under 548A, even though you don't have to have evidence that the creditors, there was an intent to defraud the creditors, or that they were defrauded, you still have to have an interest of the debtor in the property. Correct? Correct, Your Honor. There needs to be, on the face of the statute, an interest of the debtor in property. But as this court said in the Warsco versus Preferred Technology Group opinion, when assets are transferred, the purchase price for those assets is the debtor's interest in property. So in this case, the debtor's interest in property was the $10.3 million that it received on account of the invoices that were repurchased. And then the new financing, the new financing was the debtor's interest. Correct, Your Honor. Yeah. Let me, help me with this, Mr. Kline, and I'm asking this to try to understand it as a legal matter, okay? Why is it so significant, in your view, as a legal matter, that the challenged $10 million payment is a fraudulent transfer, as opposed to a prohibited preference, okay? One of the things that you do in your briefing, okay, is you're emphasizing fraud, fraud, fraud. And you're pointing us to 544 and 548, and you're saying, right along with that, this is not a situation where we're talking about an avoidable preference. Can you walk me through why that distinction is so significant? Yes, Your Honor. It's significant because the district court ruled as a matter of law. Once it went through an analysis under 547, it started there, and determined that there was no preferential transfer by application of the earmarking doctrine, which is not on the face of the Bankruptcy Code, it's a 100-plus-year-old doctrine that was judge-made. They applied that doctrine to conclude, as a matter of law, that there was no preference. They then took the phrase, interest of the debtor in property, and the district court, as other courts have done, have concluded that when there is earmarking, there is no transfer that's avoidable as a preference, and they took that same conclusion and applied it to the fraudulent transfer statute. That's why we spend a lot of time distinguishing the two. No, no, no. I get that. That's descriptive of what happened. I get that. Okay, but why is it then when, in your view, this transaction enters a fraud world? You're very clear about that. I get that, okay? Why is it that when we move out of the preference world and we move into the fraud world, that you say, everything in that preference world with respect to this equitable doctrine just falls by the wayside? Is there something, is there some legal work that the fraud is doing? In other words, why couldn't you say, as Mr. Schreiner does in his briefing, talking about the same statutory text, let's just overlay the same equitable doctrine on it, and what you're saying in your brief and what I'm trying to figure out is the why. We have a fraud situation here, and you're saying we have a fraud situation, we need to apply 544 and 548, and is it that when we enter a fraud world that the code just takes on more strength, or what's going on there? I think I understand your Honor's question, and from my perspective, the answer is the purposes of the statutes are different. Okay, explain that. The purpose of the preference statute is to avoid a race to assets, and so that all creditors get treated similarly, so no one gets more than another would have gotten had the transfer not been made. There's no actual intent any longer, there used to be, but under the bankruptcy code now, there's no actual intent of the debtor to confer a preference. It's strict liability in a sense. It's not looking to punish transactions that are done with actual intent to defraud. The actual intent to defraud gets at transactions that are culpable, where there's wrongdoing, so there's a different purpose, and in connection when you have like a Ponzi scheme, for example, you're trying to reconcile a different purpose than just a 90-day period with racing to assets. The purpose with respect to fraud is to prohibit those transactions, undo them, and make the third party who received the fraudulent transfer share that loss equally with other creditors of the estate, assuming that they're not also culpable. Mr. Klein, if the money is clawed back here, what would happen to Millennium? Millennium's not a creditor of the estate, is it? Because its agreement was with LSQ. It didn't. Or correct me if I'm wrong. I believe that's incorrect, Your Honor. Millennium has a contract with the debtor. They extended the funds. They filed a proof of claim for in excess of $10.3 million. They're the largest creditor. LSQ.